UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GRIGORIY SHCHERBAKOVSKIY,

                                         Plaintiff                              03 CV 1220 (RPP)

                      - against -
                                                                               **OPINION AND ORDER**

HOWARD G. SEITZ and DA CAPO AL FINE,
LTD.,

                                         Defendants.
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      Plaintiff Grigoriy Shcherbakovskiy filed suit against Defendants Howard G. Seitz

and Da Capo Al Fine, Ltd. ("Da Capo") in the Southern District of New York alleging

fraudulent inducement, breach of fiduciary duty, breach of contract and breach of the

covenant of good faith and fair dealing.  Defendant Da Capo counterclaimed alleging

conversion, breach of contract, and breach of fiduciary duty.  After Plaintiff failed to

produce timely discovery and failed to abide by an order of the Honorable Charles L.

Brieant directing him to produce specified categories of documents sought by

Defendants, the Court dismissed Plaintiff's complaint and granted Da Capo's

counterclaims as a discovery sanction pursuant to Federal Rule of Civil Procedure 37(b).

On appeal, the Second Circuit vacated the judgment and remanded to the district court for

further findings as to whether or not the Court's sanction was appropriate.  Currently

pending before the Court are Da Capo's motion to affirm the Rule 37(b) sanction

previously imposed and Plaintiff's motion for partial summary judgment dismissing Da

Capo's third counterclaim for conversion.  This opinion resolves each of the pending

motions.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  <u>The Pleadings</u>

On February 24, 2003, Plaintiff filed his complaint in this action.  The subject of this litigation is the U.K. bankruptcy court-supervised administration and subsequent liquidation of ZeTek Power plc ("ZeTek"), a manufacturer of alkaline fuel cells that was incorporated in the United Kingdom.  (<u>See</u> Compl. ¶¶ 1, 2; Answer ¶ 1.)[1]  According to the complaint, on October 30, 2001, Plaintiff and Da Capo entered into a Joint Venture Agreement to recapitalize and restructure ZeTek.  (Compl. ¶¶ 1, 2, 23, 25; Answer ¶ 1.) Under the agreement, Plaintiff and Da Capo, representing the principal investors in ZeTek, each contributed $250,000 toward the bankruptcy court-supervised administration costs in an effort to avoid the liquidation of ZeTek and continue its business operations while ZeTek attempted to secure additional funding, and pursuant to the agreement, if either party chose to develop a fuel cell company that party would offer the other party the opportunity to participate in such company.  (Compl. ¶¶ 2, 23; Answer ¶ 1; Zeisler Decl., Ex. B.)  Defendant Howard Seitz was at all relevant times a director of Da Capo and served as the representative of Da Capo in connection with the October 30, 2001 agreement and in connection with Da Capo's interest in ZeTek.  (Compl. ¶ 7; Answer ¶ 3; Zeisler Decl., Ex. B.)  On or about December 13, 2001, ZeTek Power ran out of funds to continue operations and the court-appointed administrator moved ZeTek into liquidation.  (Compl. ¶¶ 30-31; Answer ¶ 1.)

---

[1]  Defendants' answer and counterclaims dated April 4, 2003 are referred to herein as "Answer" and "Counterclaims" respectively because the answer and counterclaims sections of the document contain separately-numbered paragraphs.  The complaint and the answer and counterclaims are attached as Exhibits A and C respectively to the Declaration of Aaron M. Zeisler in Support of Defendants' Motion to Affirm 37(b) Sanctions dated August 14, 2009 ( "Zeisler Decl.").

On October 31, 2002, Da Capo, through a wholly owned subsidiary and under the direction of Seitz, purchased all of ZeTek's assets out of court administration, and independently purchased the assets of ZeTek's subsidiaries ZeTek Belgium and ZeTek France.  (Answer ¶ 1; Counterclaims ¶ 23; see also Compl. ¶ 36; Def. Rule Rule 37(b) Mem. at 4.)[2]  On or about November 19, 2002, Da Capo agreed to transfer the ZeTek assets to Eident Energy LLC, a fuel cell company located in the United States.  (Compl. ¶ 36; Answer ¶ 1; Counterclaims ¶ 24.)

The complaint, which Plaintiff filed on February 24, 2003, alleged: 1) fraudulent inducement; 2) breach of fiduciary duty; 3) breach of contract; and 4) breach of the covenant of good faith and fair dealing, all in connection with the October 30, 2001 Joint Venture Agreement.  (Compl. ¶¶ 37-52.)

On April 4, 2003, Defendants answered the complaint and Defendant Da Capo asserted counterclaims arising out of Plaintiff's alleged formation of a new fuel cell company, IPT Moscow ("IPT")[3] in the wake of ZeTek's liquidation.  Da Capo alleged that Plaintiff improperly usurped the assets of ZeTek Russia – one of ZeTek's subsidiaries – and transferred those assets to IPT.[4]  (See Counterclaims ¶¶ 6, 13, 15-22.) Da Capo's counterclaims alleged:  1) breach of contract; 2) breach of fiduciary duty (and sought an accounting and constructive trust to be imposed on Plaintiff and IPT); and 3) conversion.  (Counterclaims ¶¶ 25-48.)

---

[2]     Defendant/Counterclaim-Plaintiff Da Capo's Memorandum of Law in Support of Motion to Affirm Rule 37(b) Sanction dated August 14, 2009 is referred to herein as "Def. Rule 37(b) Mem."

[3]     At the time of its founding, Plaintiff was the 100% owner of IPT; later his ownership interest decreased to 45% as other investors acquired shares and he became the non-executive chairman.  (Zeisler Decl., Ex. G ¶¶ 3, 5.)

[4]     The ZeTek Russia valuable assets allegedly misappropriated by Plaintiff included a lucrative contract with the Rocket-Space Corporation of Russia a/k/a "Energia," goodwill and employees. (Counterclaims ¶¶ 13, 20-22.)

By motion dated May 5, 2003, Plaintiff moved to dismiss Da Capo's third counterclaim for conversion, arguing that ZeTek Russia was a not-for-profit organization and that under Russian law, Da Capo could have no claim of ownership over ZeTek Russia's assets and therefore, Da Capo's conversion counterclaim fails as a matter of law.[5]

## B.  Discovery Sanctions and Default Judgment

In Defendants' first request for production of documents dated June 25, 2003, Defendants requested, *inter alia*, "[a]ll documents concerning [IPT], including but not limited to, any communications with any former ZeTek customers or business partners" and "[a]ll documents concerning any fuel cell-related business entity in which you are an owner, shareholder, officer, director, employee or agent."  (See Levine Decl., Ex. 1 at ¶¶ 21-22.)[6]  In response to each of these two requests, Plaintiff did not produce any documents and on July 28, 2003, objected "on the grounds that [the request] is vague and ambiguous, overbroad, seeks information that is confidential and that is neither material nor necessary to the prosecution or defense of the litigation."  (Id.)  By letter dated August 7, 2003, counsel for Defendants wrote to counsel for Plaintiff and took issue with the above responses to request numbers 21 and 22 stating that "[d]ocuments concerning IPT Moscow are both material and likely to lead to other discoverable evidence with respect to, *inter alia*, Da Capo's First and Second Counterclaims" and proceeding to explain the relevance – namely that IPT is a fuel cell company that Plaintiff "developed"

---

[5]       On October 16, 2003, the district court (Brieant, J.) denied Plaintiff's motion to dismiss the conversion counterclaim in a two-paragraph order.

[6]       The Declaration of Eric R. Levine in Opposition to Defendants' Motion to Affirm 37(b) Sanctions dated September 25, 2009 is referred to herein as "Levine Decl."

as contemplated by the October 30, 2001 Joint Venture Agreement.  (Levine Decl., Ex. 2.)

By letter dated August 26, 2003, counsel for Plaintiff responded to the deficiency letter from counsel for Defendants.  (Levine Decl., Ex. 3.)  With respect to IPT documents, Plaintiff switched gears and no longer challenged the request based on relevance or confidentiality (as he had in his July 28, 2003 responses to Defendants' first request for production of documents (see Levine Decl., Ex. 1 ¶¶ 21-22)).  Instead, Plaintiff acknowledged that he was a shareholder in IPT and that IPT is a fuel cell-related business entity, but continued to refuse to produce IPT documents and claimed he did not personally possess the documents.  Plaintiff stated:

> With respect to IPT Moscow, plaintiff is non-executive chairman.  He does not have any operational responsibilities and does not maintain any files concerning the company.  As a general matter, plaintiff stays abreast of developments at IPT Moscow through oral reports from its representatives.  To the extent plaintiff reviews any documentation, he does not keep a copy of what he reviews.[7]

(Levine Decl., Ex. 3.)  Following a lengthy deposition of Plaintiff on November 6, 2003, counsel for Defendants again requested relevant IPT documents by letter dated November 20, 2003, pointing to numerous parts of Plaintiff's deposition testimony that made clear such documents exist and would be relevant to this action.  Specifically, Defendants noted that Plaintiff testified that he hired ZeTek Russia employees through

---

[7]      As discussed in greater detail *infra* Part II.A.3.(b), none of the reasons for non-production proffered by Plaintiff's counsel in his August 26, 2003 letter provide a legitimate basis for non-production because the terms "possession, custody, or control" in Federal Rule of Civil Procedure 34 are not limited to physical possession or personal ownership but include documents that a party has the *practical ability* to obtain.  See Bank of New York v. Meridien BIAO Bank Tanzania Ltd., 171 F.R.D. 135, 146 (S.D.N.Y. 1997).  While counsel explains in his August 26, 2003 letter that Plaintiff, for various reasons, does not have direct personal access to the requested documents, none of the reasons offered address Plaintiff's practical ability to obtain the requested documents.

Stephan Razin,[8] of which Plaintiff was 100% owner and that upon IPT's founding, all fuel-cell operations of Stephan Razin as well as employees were transferred to IPT. (Levine Decl., Ex. 4; see also Zeisler Decl., Ex. E.)

Plaintiff's counsel responded by letter dated December 1, 2003, and reiterated the points in his August 26, 2003 letter, namely that, even though Plaintiff was a 45% owner and one of only three board members of IPT, IPT documents were not within Plaintiff's custody, possession or control.  (Levine Decl., Ex. 5.)  However, for the first time Plaintiff's counsel also claimed that "[t]he documents can not be released without the authorization of IPT's board," that "Mr. Shcherbakovskiy has requested the board to provide him with documents responsive to the requests in your November 20 letter to the extent they exist" and that the board, citing confidentiality concerns, denied this request. (Id.)[9]

On December 2, 2003, the parties appeared at a pre-motion conference before the Honorable Charles L. Brieant, who had before him lengthy correspondence between the parties regarding the documents in question.  (Transcript of December 2, 2003 Conference ("12/2/03 Tr.") at 2:3-10.)[10]  Because the discussion at the December 2, 2003

---

[8]      This company is alternatively referred to in correspondence and memoranda with the alternate spelling "Stepan Razin."

[9]      In his December 1, 2003 letter, counsel for Plaintiff took issue with Defendants' document request on other grounds.  Plaintiff asserts that Stepan Razin is a brewery and not a fuel cell company.  (Levine Decl., Ex. 5.)  How Plaintiff characterizes his personal business is, of course, immaterial given that he testified clearly that at one time Stepan Razin included fuel cell operations.  (Zeisler Decl., Ex. E at 184-85.)  Plaintiff's counsel further asserted that even if Plaintiff had custody, possession or control of IPT documents, "discovery of IPT would be futile" because Defendant Seitz had been thus far unable to specifically identify any assets, employees or equipment of ZeTek Russia and therefore Da Capo's counterclaims were "fundamentally flawed."  (Levine Decl., Ex. 5.)  As Plaintiff's counsel knows, and surely knew at the time, his subjective assessment of the merits of Da Capo's counterclaims in no way provides an excuse for non-production of properly requested documents pursuant to the Federal Rules of Civil Procedure.  Some of the arguments contained in counsel's December 1, 2003 letter are at best circular and evasive and at worst an example of objectively obstructionist conduct.

[10]     A copy of the Transcript of the December 2, 2003 Conference is included in the motion papers as Levine Decl., Ex. 6.

conference is central to the instant motion, it is quoted in some detail.  After Defendants'

counsel provided a brief summary of the facts of this action and the discovery dispute at

issue, Judge Brieant had the following exchange with Plaintiff's counsel, Stephen

Weinstein:

| | |
|---|---|
| THE COURT: | You don't believe that he has no control over the documents, do you? |
| MR. WEINSTEIN: | Yes, I do. |
| THE COURT: | I think a jury is going to be very incredulous when they're confronted with that, and you buy the farm around here. If you're going to take a bad position in discovery like that or allow your client to take it, you're not going to come in and blow hot and cold at the trial. You're not going to take a different position with me, because if you are, your adversary is going to ask for a jury instruction. |
| MR. WEINSTEIN: | Our position, we've been informed under Russian law -- |
| THE COURT: | Don't give me that. |
| MR. WEINSTEIN: | He has no control. |
| THE COURT: | You're a plaintiff here in Westchester County, New York. You're under my discovery rules. If you don't abide by my discovery rules, two things are going to happen. Either you're going to lose your case on the merits with the jury because they're going to figure your client is lying, or you're going to get dismissed on the merits by the Court for failing to honor my directions. I don't care about Russian law. I believe that the average juror will think that he has constructive possession of these records and he can get to them if he really wants to. |
| MR. WEINSTEIN: | With all due respect, your Honor, this Court doesn't have power to order the company to turn over the documents. |
| THE COURT: | But I have power to dismiss your case with prejudice and costs.  I'll do that right now. |
| MR. WEINSTEIN: | These documents, first of all, are not for our case, they're for defense's -- |
| THE COURT: | No, no.  Don't give me that. |
| MR. WEINSTEIN: | But it's true. |
| THE COURT: | It's not true.  You're going to produce them under a protective order or I'm going to toss your case and you'll explain to the Second Circuit.   It's that |

|  |  |
|---|---|
|  | simple truth with me.  I don't have time to listen to a lot of drivel. This is ordinary discovery.   Your client sought out this forum. |
| MR. WEINSTEIN: | My client is suing individually. He's being counterclaimed individually.   ITP is not a party to this.  If they want these documents, they could have sued -- |
| THE COURT: | I'm going to order their production within 20 days. I'm going to have a precise enough order so I can make it stick.  If you don't comply, I'm going to drop the case for the plaintiff, dismiss it with prejudice and costs and I'm going to take an inquest on the counterclaims and you can go on your merry way.  I don't have to listen to this kind of nonsense and I take a dim view of this fellow saying he can't, that he has no access to these records.  He's what, the chairman of the board, is that what he is? |
| MR. WEINSTEIN: | He's chairman of the board.  He doesn't control the board.  He's not the majority shareholder.  He asked the board to produce the documents at a recent meeting following the letter I got from  Mr. Callaghy -- |
| THE COURT: | I don't believe it.  I'm telling you right now I don't believe it.  Why don't the two of you confer and get a protective order and take 15 days to go get these records.   I'll adjourn your December 19th date, although I don't want to do so.  And after that, if you don't comply with United States discovery, out you go. Do you want to do that? |
| MR. WEINSTEIN: | I have no choice. |
| THE COURT: | You have no choice except to call my bluff, which is not a bluff, and go to the Circuit, because you're not going to do this, you're not going to access a federal forum in the United States and come in here and tell this court and tell a jury, oh, I'm suing individually.  I'm only the chairman of the board and I can't produce any of these allegedly relevant documents, and then tell him also they don't exist. They'll laugh at you.  You've done enough trial work to know that.  These jurors will be smirking. |

(12/2/03 Tr. at 8-10.)

\*      \*      \*

| THE COURT: | You're not going to split his identity.  He's here and |
|---|---|

|  | he's going out the window unless he complies with United States discovery.  That's it.  If you want to confer with each other and see if you can find a fair way to resolve this, do it.  I can't give you the jury room because it's occupied, but I'd like [you to] talk with each other. |
|---|---|
| MR. WEINSTEIN: | I would need to consult with my client.  But I believe that since he has no control over ITP -- |
| THE COURT: | I don't believe it.  I told you that. |
| MR. WEINSTEIN: | -- he may be unable to comply with the order. |
| THE COURT: | And maybe the moon will fall onto the earth.  Lots of things can happen in the future.  I won't put up with this nonsense, I'm telling you right now.  If you want to stick to your position, then I'm going to ask Mr. Callaghy to draft a proper order ordering precisely what's to be produced, setting a reasonable time to do it, giving you a return date to come in here and produce it here in court.  I want him to add into that proposed order any protective provisions that you need to preserve your trade secrets or whatever.  And then if he doesn't do it, out you go and I'll hold an inquest on the counterclaims.  If you want to gamble on whether the Circuit will uphold that, you can gamble.  Your client can gamble. I don't care. |
| MR. WEINSTEIN: | All right.  I'll consult with Mr. Callaghy and with my client.  I believe that we're going to have to go to the Second Circuit on this. |
| THE COURT: | That's fine with me.  I'm not going to allow anybody to come in here as a plaintiff and lie like that or take the position that I'm only here individually and I can't access these Russian records because I don't control the board, I'm only the chairman. |

(Id. at 11-12.)

The transcript makes clear that Judge Brieant took a "dim view" of a number of

Plaintiff's arguments.  He rejected counsel's suggestion that the requested documents

only related to Da Capo's counterclaims (id. at 9:5-13), which, even if true, would not

provide an excuse for non-production.  Likewise, Judge Brieant rejected Plaintiff's

contention that because he was suing individually, that should excuse him from

producing documents from a company in which he has a sizeable ownership interest and over which he exercised some degree of control.  (<u>Id.</u> at 9:14-25, 11:1-6.)  Judge Brieant further expressed extreme skepticism about Plaintiff's claim that he had no control or the practical ability to obtain the requested documents, stating a number of times "I don't believe it."  (<u>Id.</u> at 10:5-6, 11:9.)  In light of Plaintiff's deposition testimony and the correspondence between counsel, the record fully supported Judge Brieant's conclusion that Plaintiff was being obstructive in discovery and playing with the Court.

At the December 2, 2003 conference, Plaintiff's counsel also raised – for the first time – the argument that Russian law somehow prevented Plaintiff from producing the requested IPT documents.  (<u>Id.</u> at 8:11-12; <u>see also</u> Levine Decl., Ex. 7.)  Judge Brieant similarly dismissed this throw-in argument, stating "I don't care about Russian law." (12/2/03 Tr. at 8:21-22.)  As discussed *infra*, the Second Circuit held that Judge Brieant abused his discretion in declining to consider Russian law.

By order dated December 11, 2003, Judge Brieant, based on his review of the correspondence between counsel and based on the oral argument held on December 2, 2003, ordered Plaintiff to produce the documents requested by Defendants, which were described with specificity in ten paragraphs in the December 11, 2003 order.  (Zeisler Decl., Ex. D.)  In accordance with Judge Brieant's warnings at the December 2, 2003 conference, the order once again specifically warned that "[i]f plaintiff fails to produce documents responsive to the items listed above on or before January 6, 2004, the Court will dismiss the Complaint, with prejudice and with costs, against the plaintiff and will grant the counterclaims of Da Capo and schedule an inquest to hear evidence on the counterclaims commencing January 20, 2004."  (<u>Id.</u> at 3.)

On or about January 12, 2004, Plaintiff moved for reconsideration of Judge Brieant's December 11, 2003 discovery order.[11]  As part of his moving papers, counsel included a declaration by Mr. Shcherbakovskiy dated December 22, 2003 that argued the same points previously raised in counsel's letter of December 1, 2003 and previously raised at the December 2, 2003 conference, namely that he does not have possession or control of any of the IPT documents sought by Defendants, that he had asked the IPT board for permission to produce the documents and the board refused, and that Russian law barred the documents' production.  (See Zeisler Decl., Ex. G.)  Several documents were attached to Plaintiff's December 22, 2003 declaration, including the IPT board resolution purporting to deny Plaintiff's request for documents, various confidentiality agreements and a letter – not a declaration, affirmation or affidavit – from a Russian attorney, Maxim Volinsky, who opined on questions of Russian law.[12]  (See id (Exs. 3, 4, 5, 7, 8 thereto).)

Plaintiff did not produce the requested documents by January 6, 2004 as required by Judge Brieant's December 11, 2003 order.  Accordingly, on January 30, 2004, Judge Brieant issued a default judgment dismissing Plaintiff's complaint with prejudice and

---

[11]     The motion for reconsideration was fully briefed on January 23, 2004.

[12]     Volinsky's letter offers three general conclusions about Shcherbakovskiy's discovery dispute. First, he concludes that "the Board of Directors legitimately denied your request to reveal such information to a court of the foreign state."  (Zeisler Decl., Ex. G (Ex. 8 thereto).)  This conclusion misses the point as it says nothing about whether Shcherbakovskiy's production of documents for which he had the practical ability to obtain would violate Russian law in any way.  Second, Volinsky concludes that, as a shareholder, Shcherbakovskiy does not have the ability to release IPT's information without running the risk of being held liable for damages.  (Id.)  Of course, being exposed to possible civil liability for breach of a mutual agreement of confidentiality is not the same as being barred from producing documents by operation of Russian law.  Furthermore, general confidentiality concerns were addressed in Judge Brieant's December 11, 2003 order, particularly by the parties' ability to designate documents "Attorneys' Eyes Only."  (Zeisler Decl., Ex. D at 4-5.)  Finally, Volinsky concludes that, due to the nature of the technical documentation at issue, Shcherbakovskiy's release of IPT documents "may well be interpreted as treason."  (Zeisler Decl., Ex. G (Ex. 8 thereto).)  This conclusion cites to no Russian cases or legal authority, lacks analysis or support and seems implausible on its face; given that Shcherbakovskiy is a United States citizen it strains credulity to believe that his disclosing business documents to a United States court under an appropriate protective order could subject him to treason charges in Russia.

with costs and granting Da Capo's counterclaims pursuant to Federal Rule of Civil

Procedure 37(b).  On March 8, 2004, Judge Brieant denied Plaintiff's motion for

reconsideration, noting that "Plaintiff has not provided any additional evidence that

requires the Court to change its position on the discovery Order."  (Levine Decl., Ex. 8.)

The Court held a three day jury trial on damages from December 20-22, 2004 and on

January 3, 2005, the Court entered judgment in favor of Da Capo in the amount of $1.4

million plus prejudgment interest.[13]

On January 20, 2005, Plaintiff appealed the default judgment and denial of his

motion to dismiss the conversion counterclaim with the Second Circuit.  He argued, *inter

alia*, that the default judgment dismissing his complaint and granting the counterclaims

was an abuse of discretion.

**C.  Second Circuit Reversal**

On June 11, 2007, the Second Circuit vacated the default judgment.  While the

Second Circuit noted that "district courts possess 'wide discretion' in imposing sanctions

under Rule 37" and that "if a party has access and the practical ability to possess

documents not available to the party seeking them, production may be required,"

Shcherbakovskiy v. Da Capo Al Fine, Ltd., 490 F.3d 130, 135, 138 (2d Cir. 2007)

(citations omitted), the court nonetheless vacated the default judgment as an abuse of

discretion because "[n]either the December 12, 2003 order nor the January 30, 2004

judgment contain factual findings or legal reasoning underlying and explaining the

default judgment," id. at 135, and because the district court's adverse credibility finding

against Shcherbakovskiy and its conclusion that Russian was irrelevant to United States

---

[13]        The jury determined that Da Capo was entitled to $500,000 in compensatory damages for
Plaintiff's breach of contract and $1.4 million for the conversion of ZeTek Russia's assets.  However,
Judge Brieant awarded Da Capo only $1.4 million judgment to avoid double recovery.

discovery matters (both expressed at the December 2, 2003 conference) could not support the sanction imposed, even under an abuse of discretion standard, id. at 138-39.[14]  The Second Circuit stated that:

> A remand is therefore necessary to explore Russian law and, if necessary, appellant's control of IPT, an issue that may involve a finding as to his credibility.  Both the inquiry into Russian law and appellant's control of IPT will inform a finding as to appellant's willfulness, or lack thereof, in refusing to produce the documents.

Id. at 139.  The Second Circuit emphasized that "there may be a plausible explanation that supports the dismissal and default judgment entered by the district court."  Id. at 140. See also id. at 141 (each issue relevant to Plaintiff's motion to dismiss Da Capo's conversion counterclaim "may also become irrelevant if a valid dismissal as a sanction is entered"); id. at 141 ("The sanction of granting the counterclaims may be reentered and valid").[15]  Finally, the Second Circuit reassigned the case to a different district court judge on remand.  Id. at 142.

**D.  Proceedings After Remand**

After briefing the first issue on remand – whether Russian law precluded production of the requested documents – the parties appeared for a hearing on December 15, 2008, before the Honorable Kenneth M. Karas, to whom this matter was reassigned on remand.  After hearing argument and making a record of the Russian law expert opinions reviewed, Judge Karas answered the threshold question posed by the Second Circuit: "I find that Russian law does not bar the production, assuming the agreement of

---

[14]      In holding that Russian law was relevant to the discovery dispute, the Second Circuit stated that "[i]f Russian law prohibits appellant from obtaining and producing the documents even with the agreement of IPT's board and an appropriate protective order in the district court, then the matter is at an end." Shcherbakovskiy, 490 F.3d at 139.

[15]      The Second Circuit, in light of its ruling vacating the default judgment, declined to reach the merits of Plaintiff's appeal of the district court's denial of his motion to dismiss the conversion counterclaim, but the court denied Da Capo's cross-appeal, finding no fundamental error in the special verdict form at the damages trial.  Shcherbakovskiy, 490 F.3d at 140-42.

the IPT Board and an appropriate protective order in this court, the production of at least some of these documents." (Transcript of December 15, 2008 hearing ("12/15/08 Tr.") at 75.)[16]

After the December 15, 2008 hearing, the parties engaged in additional discovery. In response to Defendants' second request for production of documents dated February 6, 2009 (Zeisler Decl., Ex. K), Plaintiff produced approximately 1000 responsive IPT documents (Levine Decl. ¶ 6). On June 25, 2009, counsel for Defendants deposed Mr. Shcherbakovskiy for a second time.

On August 14 and 17, 2009, Defendants and Plaintiff filed the instant motions, which were each fully briefed on or before October 16, 2009. The Court heard oral argument on the motions on April 15, 2010.[17]

## II.  DISCUSSION

### A.  Defendants' Motion to Affirm Judge Brieant's Rule 37(b) Sanctions

Defendant Da Capo moves this Court to affirm Judge Brieant's sanctions, arguing that the record supports a finding that Plaintiff had control over the IPT board in November 2003, that the board resolution was a "sham" and that the record establishes Plaintiff acted willfully and in bad faith in refusing to comply with Judge Brieant's December 11, 2003 discovery order. Plaintiff argues the sanctions issue is no longer on

---

[16]     A copy of the December 15, 2008 hearing transcript is included in the motion papers as Levine Decl., Ex. 9.

[17]     By order dated August 21, 2009, the Court, *sua sponte* raised the issue of subject matter jurisdiction, noting that Plaintiff, who invoked the jurisdiction of this Court as "a resident of St. Petersburg, Russia" (Compl. ¶ 6), appeared to have been a United States citizen residing abroad, and thus diversity jurisdiction may be lacking. After receiving briefing from the parties on the issue of Plaintiff's domicile at the time the complaint in this action was filed, the Court held an evidentiary hearing on November 23, 2009. By opinion and order dated March 23, 2010, the Court held that it had subject matter over the instant action because Plaintiff was a United States citizen domiciled in Connecticut when he invoked the jurisdiction of the Court.

the table because he has now produced voluminous IPT documents responsive to the December 11, 2003 order in proceedings since the Second Circuit remand and Judge Karas' decision on Russian Law, and because the Court has placed this case back on a normal discovery track.  In the alternative, Plaintiff argues that, given the various confidentiality agreements and the IPT board's decision, he was unable to comply with the December 11, 2003 order or, at a minimum, that his failure to comply was based on a good-faith reliance on his understanding of Russian law.

### 1. <u>Legal Standard</u>

If a party fails to obey a discovery order, a court may sanction the party in regard to the failure, including, but not limited to, "dismissing the action or proceeding in whole or in part."  Fed. R. Civ. P. 37(b)(2)(A)(v).  While the sanction of dismissal is undoubtedly a "drastic remedy that should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions," <u>John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.</u>, 845 F.2d 1172, 1176 (2d Cir. 1988) (internal citations omitted), the court has wide discretion in imposing sanctions under Rule 37.  <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002).  Sanctions imposed by a district court pursuant to Rule 37(b)(2) must be "just" and must "relate to the particular claim to which the discovery order was addressed."  <u>Daval Steel Prods. V. M/V Fakredine</u>, 951 F.2d 1357, 1366 (2d Cir. 1991).  In evaluating whether a sanction of dismissal is appropriate, courts should consider:  "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance."  <u>Agiwal v. Mid Island</u>

<u>Mortg. Corp.</u>, 555 F.3d 298, 302 (2d Cir. 2009).  The imposition of severe sanctions under Rule 37 is necessary to discourage dilatory tactics and to avoid a situation where compliance with discovery orders comes "only when the backs of counsel and the litigants [are] against the wall."  <u>Sieck v. Russo</u>, 869 F.2d 131, 134 (2d Cir. 1989).

### 2.  <u>Mootness</u>

As a threshold matter, Plaintiff asserts that the sanctions issue is moot.  (<u>See</u> Pl. Rule 37(b) Mem. at 5, 8-11.)[18]  This assertion is without merit.  The Second Circuit made clear repeatedly that a valid dismissal as a sanction could be re-imposed if supported by the record.  <u>See</u> <u>Shcherbakovskiy</u>, 490 F.3d at 140-41.  Plaintiff argues that his subsequent production of numerous responsive IPT documents somehow excuses or moots the sanctions issue.  (<u>See</u> Pl. Rule 37(b) Mem. at 1-2, 7-10.)  Nothing in the record supports such an assertion and to adopt Plaintiff's position would be to fly in the face of the Second Circuit's directive to conduct a two-part analysis – first to explore Russian law and second, if necessary, to explore "[Plaintiff's] control of IPT, an issue that may involve a finding as to his credibility.  Both the inquiry into Russian law and [Plaintiff's] control of IPT will inform a finding as to [Plaintiff's] willfulness, or lack thereof, in refusing to produce the documents."  <u>Shcherbakovskiy</u>, 490 F.3d at 139.

Plaintiff also argues that on December 15, 2008 and thereafter, Judge Karas "reset[] the discovery clock," that he "made it clear that production of the IPT documents would moot that issue," and that the second prong of the Second Circuit's directive would be addressed "only should Shcherbakovskiy fail to produce IPT documents."  (Pl. Rule 37(b) Mem. at 9-11.)  Plaintiff apparently bases his understanding of the "course

---

[18]     Plaintiff's Memorandum of Law in Opposition to Da Capo's Motion to "Affirm" Rule 37(b) Sanction dated September 25, 2009 is referred to herein as "Pl. Rule 37(b) Mem."

charted by Judge Karas" (Id. at 1) on the final moments of the December 15, 2008

hearing.  But a fair reading of the transcript in its full context does not support Plaintiff's

characterization.  First, when Judge Karas "'turned it back' to the parties and referred the

factual questions to the Magistrate Judge 'to supervise discovery and any hearings that

might need to take place'" (id. at 9 (quoting 12/15/08 Tr. at 77)), he was referring to

discovery related to the second question posed by the Second Circuit, not the 2003

requests for IPT documents (see 12/15/08 Tr. at 75-77), and Judge Karas made it clear

that:

> Judge Winter is quite clear that if the answer to the first question was yes,
> then the matter was at an end.  But if the answer to the first question,
> which I have answered in the negative, if one gives that answer, then the
> next step is to determine whether or not defendants could establish that the
> IPT Board's decision is not a valid excuse for a noncompliance, because
> IPT is Mr. Shcherbakovskiy's alter ego, or otherwise his control of the
> company through his investment is sufficient enough to give him
> undisputed control of the Board.

(Id. at 75-76.)  Plaintiff cites no support for his assertion that Judge Karas somehow

abandoned this clear articulation of the next step in this matter.  Plaintiff appears to rest

his theory of a new "charted course" on a few lines of one page of the hearing transcript:

> MR. LEVINE:  Perhaps Mr. Zeisler, if he wants to take Your Honor
> up on your suggestion that we narrow the requests,
> send them to us, and then we can see if we can work
> that out.
>
> THE COURT:  I think that's a[] good idea.  I think that's an
> excellent suggestion, because some of this stuff is
> quite broadly worded, and Judge Brieant never even
> got to that.  And I am sure, as I say, you would have
> some other more traditional objections.  I think
> that's a fair request.
> So, why don't you talk along those lines, and then if
> you work that out, fine.  If not, then you can work
> out a schedule with the Magistrate Judge if there is
> a dispute or something, but I think that's a very
> helpful suggestion and I thank you for that.

(Id. at 78.)  While the Court clearly encouraged any cooperation and agreement the parties could come to, nothing in this excerpt can be fairly read to support Plaintiff's sweeping assertion that in the event of a document production by Plaintiff, the second portion of the Second Circuit's instructions would be mooted or that the Court had reset the discovery process.[19]

### 3. **Propriety of Judge Brieant's Discovery Sanction**

The issue of Plaintiff's control over the IPT board and the issue of his willfulness or bad faith in failing to comply with Judge Brieant's discovery order should be considered together because one will inform the other.

(a)   Plaintiff's Control Over the IPT Board

As Defendants point out, Plaintiff's control over the IPT board in November 2003 is shown by the fact he was admittedly (i) chairman of the board; (ii) a 45% owner; (iii) founder and 100% owner at its formation.  Plaintiff's control over the IPT board is also shown by the fact that prior to IPT's formation, the employees who made up IPT's fuel cell operations were employed by Plaintiff's 100% owned private business Stephan Razin (and by ZeTek Russia) and the fact that the fuel cell operations and employees were transferred to IPT which was then 100% owned by Shcherbakovskiy.  Plaintiff argues that he did not have control over the board because, as of November 2003, he was only a 45% owner and a non-executive director.  However, the other two directors were Ziya Karichev and Alex Yusefovsky, former employees of ZeTek Russia and Stephan Razin, who Plaintiff placed in charge of IPT and to whom Plaintiff transferred ownership

---

[19]   Plaintiff's related argument that no sanctions can be "affirmed" because the Second Circuit vacated Judge Brieant's discovery order and therefore no order is in place that Plaintiff could have violated (Pl. Rule 37(b) Mem. at 7-8) is similarly without merit because the Second Circuit made clear that "[t]he sanction of granting the counterclaims may be reentered and valid."  Shcherbakovskiy, 490 F.3d at 141.

interests in IPT, which raises the strong suggestion that the other two IPT board members were beholden to Plaintiff.

Defendants further point out that in 2009, when Plaintiff finally produced IPT documents, he took the position that he was no longer chairman of the IPT board, was no longer a shareholder and held no position whatsoever at IPT. (See Zeisler Decl., Ex. M at 27-29.) Yet at that time he had the practical ability to obtain IPT documents by only making an informal request for them.[20] In 2009, no board resolution was required, yet the company was under the same management as in 2003. This strongly indicates that Plaintiff concocted the 2003 board resolution to obstruct Defendants' discovery.

        (b)      <u>Plaintiff's Ever-Changing Excuses for Non-Production</u>

Plaintiff's ever-changing objections to Defendants' discovery, starting in July 2003 and continuing through January 2004, also support a finding of Plaintiff's willfulness and a finding that the IPT board resolution was a manufactured excuse for non-production.

In his responses and objections dated July 28, 2003, Plaintiff first refused to produce IPT documents based on the objection that the requests were "vague and ambiguous" and "overbroad" and based on the objection that the information sought "is confidential and [] is neither material nor necessary to the prosecution or defense of the

---

[20]    The production of documents in 2009 is, of course, something Judge Brieant could not have considered in 2003 and Plaintiff correctly notes that the 2009 production in itself is not sufficient to show that Plaintiff had control over the IPT board in 2003. (Pl. Rule 37(b) Mem. at 14-15.) Nevertheless his ease of production in 2009 is relevant and probative to the issues of whether Plaintiff had the practical ability to obtain documents from IPT in 2003. If anything, in 2009, IPT had a board that was *more* independent from Plaintiff than it was in 2003. Yet in 2009, in order to obtain documents from IPT, all Plaintiff did was ask for them (Def. Rule 37(b) Mem. at 9; Zeisler Decl., Ex. M at 160-62) and no resolution by the board was required.

litigation." (Levine Decl., Ex. 1 ¶¶ 21-22.)[21]  In those responses and objections, Plaintiff

made no mention of a board resolution or the need to obtain permission of the IPT board

in order to produce documents, nor did he object based on the constraints of Russian law.

In a letter to defense counsel dated August 26, 2003, Plaintiff again refused to

produce IPT documents, this time because he personally did not maintain files

concerning the company (Levine Decl., Ex. 3) – a different reason for non-production

than what was set forth in his July 28, 2003 responses and objections.  Again, Plaintiff

did not argue that he did not have the practical ability to obtain the requested documents,

and made no mention of the need to obtain permission of the IPT board or his alleged

inability to produce because of Russian law.[22]

After Defendants were forced to take Plaintiff's lengthy deposition on November

6, 2003 (which consisted of more than 250 pages of transcription) in order to gain

evidentiary support for their claim that Plaintiff had the ability to supply the requested

documentary evidence, On December 1, 2003, in a letter again refusing to produce IPT

documents, counsel for the Plaintiff for the first time asserted that Plaintiff would need

the approval of IPT's board to produce the requested documents and for the first time

---

[21]       While Plaintiff continued to assert his objection based on confidentiality, his objection that no
such documents would be "material" or "necessary to the prosecution or defense of the litigation" is
patently without merit.  Given that IPT's business in 2003 unquestionably included fuel cell operations and
its employees in 2003 included Dr. Yuzefovsky and Dr. Karichev – former ZeTek Russia employees –
Plaintiff's assertion in his Responses and Objections that IPT documents would not be material is
indefensible and suggests strongly that Plaintiff was being less than totally honest and forthcoming in
responding to discovery requests.

[22]       During his November 6, 2003 deposition, Plaintiff provided a number of evasive answers that
strongly suggest he was deliberately frustrating Defendants' attempts to obtain meaningful discovery.  (See,
e.g., Zeisler Decl., Ex. E at 13:6-9 ("Q.  Does IPT have any brochures or other publicity documents relating
to the work that it does?  A.  I don't know."), 185:4-5 ("Q.  How many employees did you hire?  A.  I don't
know."), 249:9-15 ("Do you have any documents between you and Ziya Karichev regarding ZeTek Russia?
A.  I don't have any documents dated by the period of that time when ZeTek Russia was in existence.  But
concerning that, if Mr. Karichev worked for ZeTek Russia, I don't know anything.  So I can't really answer
your question.").)

claimed the Plaintiff had asked the board for approval and been refused.[23]  Judge Brieant therefore was faced with a moving target of objections to the production of IPT documents which had taken place over a four-month period.  The fact that Plaintiff first raised the need for board approval and the implications of Russian law in light of the board's denial on December 1, 2003 – the issues ultimately pressed at the December 2, 2003 conference, in Plaintiff's January 12, 2004 motion for reconsideration and re-argument, and on appeal – over *four months* after Plaintiff initially refused to produce IPT documents strongly suggests that these excuses for non-production were conceived later as a last-minute excuse for Plaintiff's decision not to produce that had been made four months prior.[24]  To the extent Plaintiff argues that his inability to produce IPT documents was the result of the board resolution and the application of Russian law thereto, such an argument rings hollow because the board resolution did not take place until four months after Plaintiff refused to produce IPT documents.

The ever-changing nature of Plaintiff's objections to Defendants' requests for IPT documents and the lateness of his reliance on the requirement of a board resolution and Russian law (when any such objections would have been evident at the outset) strongly suggest Plaintiff's objections were manufactured for the purpose of avoiding his production obligations.  When considered in light of Plaintiff's role in the company in 2003 and the ease at which he obtained IPT documents in 2009, the late emergence of the

---

[23]    The specific argument that, given the board's decision, Russian law barred Plaintiff from producing the requested documents does not appear in the December 1, 2003 letter and appears to have been raised for the first time at the December 2, 2003 conference.

[24]    To the extent Plaintiff relied on Russian law in refusing to answer questions at his November 6, 2003 deposition, that does not change this analysis because Plaintiff still first invoked Russian law as a bar to discovery more than three months after his initial responses and objections.  Moreover, at his deposition, Plaintiff could not have relied on the effect of the board resolution by operation of Russian law because the board resolution purportedly took place more than three weeks after Plaintiff's November 6, 2003 deposition.

board resolution also supports the conclusion that the requirement of a board resolution was a straw man erected to prevent Defendants' access to the requested documents. As argued by Defendants, the only conclusion that can be drawn from the record is that the board resolution was only sought as legal cover for Plaintiff's predetermined decision not to produce IPT documents and was a "sham."[25]

      (c)      <u>Plaintiff's Blanket Refusal to Produce IPT Documents</u>

Plaintiff's purported good faith in 2003 is further negated by his blanket, across-the-board objection to producing any and all documents responsive to request numbers 21 and 22 of Defendants' first request for production of documents. If the confidentiality concerns cited in Plaintiff's responses and objections were the true reason for his refusal to produce IPT documents, he certainly could have produced more than one document – the Registration Certificate of IPT (<u>see</u> Levine Decl., Ex. 5) – between June 2003 and January 2004. He must have had documentation of his ownership of IPT stock, or of the transfer of the fuel cell technology and employees from Stephan Razin to IPT given he still was 100% owner of Stephan Razin. He also must have had some record of his transfer of ownership shares in IPT to Ziya Karichev, Alex Yusefovsky and Gia Gvichia. (<u>See</u> Levine Decl., Ex. 20 at 64-66, 76.)

Further, Plaintiff's actions after the entry of Judge Brieant's December 11, 2003 discovery order are telling. The order provided for the protection of confidential

---

[25]      At the November 23, 2009 hearing on the issue of Plaintiff's domicile, certain portions of his testimony were patently incredible. Plaintiff's statement that he and his wife have resided in Russia continuously since 1996 is directly at odds with his assertion that he and his wife were naturalized as United States citizens in 2001 and 2007 respectively. (<u>See</u> Opinion dated March 23, 2010 at 5.) Either his hearing testimony was false, or he provided false information in connection with his application for citizenship. (<u>Id.</u>) Da Capo also notes a number of examples of inconsistent or contradictory testimony by Mr. Shcherbakovskiy which, on their face, appear to demonstrate his lack of credibility. (<u>See</u> Def. Rule 37(b) Mem. at 9-12, 22-23.) Examples of Plaintiff's general lack of credibility further support a finding of willfulness and bad faith in connection with his refusal to produce documents in 2003.

documents and permitted the parties to use an even more confidential "Attorneys' Eyes Only" designation.  (Zeisler Decl., Ex. D.)  If Plaintiff's purported concerns over the confidentiality of IPT documents were truly his reason for non-compliance, he could have at least made a good faith effort to comply with Judge Brieant's order by producing some or all IPT documents in light of the added confidentiality protections afforded to the parties by the December 11, 2003 order.  Or, at a minimum, Plaintiff could have returned to the IPT board and explained the additional levels of protection available to confidential business documents that were disclosed in this litigation, particularly given that confidentiality was the primary concern expressed by the board resolution in its purported denial of Plaintiff's request for documents on November 26, 2003.  (See Zeisler Decl., Ex. G (Ex. 5 thereto).)  Either one of these actions would have been indicative of a good-faith attempt at compliance on the part of Plaintiff.  Instead, Plaintiff made a motion for reconsideration and re-argument of Judge Brieant's December 11, 2003 order, providing additional briefing and additional documents, but relying on the same facts and arguments put forth at the December 2, 2003 conference, which Judge Brieant had already rejected.  While there is nothing wrong with Plaintiff moving for reconsideration, the fact that he did not make a good faith attempt at compliance with the December 11, 2003 order and instead refused to comply, resting on factual and legal arguments already rejected by the Court, is significant.

In sum, Plaintiff's role as chairman of the board and 45% owner of IPT in 2003 and the ease at which he obtained documents from the same company in 2009 notwithstanding the fact that he claimed no longer to be an owner or director of the company support a finding that Plaintiff in 2003 had the practical ability to obtain IPT

documents and had practical control over the board.  Further, his blanket refusal to produce any documents and his failure to even attempt compliance after the entry of Judge Brieant's December 11, 2003 order, support a finding of willfulness and bad faith. The suspicious and strategic timing of Plaintiff's invocation of Russian law and his assertions that he could not obtain IPT document's without the board's consent further support a finding of willfulness and bad faith.  As the Second Circuit properly noted, the finding of control and the finding of willfulness inform one another, Shcherbakovskiy, 490 F.3d at 139, and the Plaintiff's bad faith with respect to the self-serving, strategic timing of his various objections to production support the finding that the board resolution was not, in fact, what Plaintiff relied on in refusing to produce IPT documents and support the finding that the board resolution was an after-the-fact creation to justify Plaintiff's decision not to produce and was therefore a "sham."

### 4. Efficacy of Lesser Sanctions and Warnings of the Consequences of Non-Compliance

In evaluating the appropriateness of a particular sanction under Rule 37, in addition to the willfulness or bad faith of the non-compliant party, a court should consider:  (1) the efficacy of lesser sanctions; (2) the duration of the period of noncompliance; and (3) whether the non-compliant party had been warned of the consequences of noncompliance.  Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir. 2009).  Indeed, the Second Circuit specifically directed the district court to consider the efficacy of lesser sanctions on remand.  Shcherbakovskiy, 490 F.3d at 139-40.  From the record before this Court it is apparent that lesser sanctions would have been futile.  Judge Brieant warned Plaintiff multiple times of the possibility of dismissal as a sanction at the December 2, 2003 conference.  (Levine Decl., Ex. 6 at 9-11, 13.)  Again,

in the December 11, 2003 order, the Court warned Plaintiff that if he failed to comply

with the order, "the Court will dismiss the Complaint, with prejudice and with costs,

against the plaintiff and will grant the counterclaims of Da Capo and schedule an inquest

to hear evidence on the counterclaims . . ."  (Zeisler Decl., Ex. D.)  Given that Judge

Brieant gave Plaintiff numerous warnings that he intended to impose the severe sanction

of dismissal and granting the counterclaims, and nevertheless Plaintiff did not comply

with the discovery order, even under its "Attorneys' Eyes Only" provision to ensure

confidentiality, it is clear that lesser sanctions would have been futile.

Though the duration of the period of non-compliance between the discovery order

and the dismissal was shorter in this matter than in many other cases, the period of non-

compliance between Defendants' first request for production of documents and the

sanction of dismissal was over seven months.  Further, considering Plaintiff's evasive

objections and his failure to raise the issues of the board resolution and Russian law until

four months after his initial responses and objections, and considering Plaintiff's willful

blanket refusal to comply with the December 11, 2003 discovery order in the face of

multiple warnings from Judge Brieant and its provisions for confidentiality, the record

shows that giving Plaintiff more time to comply prior to imposing the sanction would not

have mattered.[26]

---

[26]      Indeed, Judge Brieant did not impose the sanction of dismissing the complaint and granting the
counterclaims until January 30, 2004.

Plaintiff argues, and the Second Circuit noted,[27] the possibility that the requested documents might only be relevant to the counterclaims, and if so, the portion of Judge Brieant's sanction dismissing the complaint could be unwarranted.  As Defendants have noted on multiple occasions (Def. Rule 37(b) Mem. at 21 n.14; Levine Decl., Ex. 9 at 8.), and as Judge Brieant's December 11, 2003 order specifically stated,[28] the requested IPT documents relate not only to Da Capo's counterclaims, but to Defendants' affirmative defenses (see Zeisler Decl., Ex. C ¶¶ 31-35), particularly unclean hands and estoppel.

Da Capo notes that the claims in the complaint and the counterclaims arise under the same contract – the October 30, 2001 Joint Venture Agreement, which  contemplates that each party would have the opportunity to participate in, and share in the benefits of, any fuel cell technology company developed by the other.  (Zeisler Decl., Ex. B.)  It would be manifestly inequitable and prejudicial to Da Capo to allow Plaintiff to gain the benefit of that agreement by unwinding the dismissal of the complaint when Da Capo's right to participate in the fuel cell developments of ZeTek Russia and IPT were cut off by Plaintiff in 2003.  At the damages trial in 2004, Defendants were prevented from obtaining the testimony of Dr. Karichev and other IPT employees through which they could have established the value of technology and intellectual property developed by IPT – a possible measure of damages for breach of the October 30, 2001 Joint Venture

---

[27]     [W]hile the documents in question appear to relate only to appellees' conversion counterclaim, the district court dismissed appellant's complaint as well, again without findings or other explanation.  We do note that appellant's claims may be so related to the ownership of ZeTek Power, and through it, ownership of ZeTek Russia that appellant should not be allowed to pursue them in the face of a valid default judgment for appellees on the counterclaims.  Such a conclusion, however, can be reached only after further consideration by the district court.
Shcherbakovskiy, 490 F.3d at 140.

[28]     "[Defendant] having sought the production of documents *in support of its defenses* and counterclaim for breach of contract, conversion, an accounting, and constructive trust . . ."  (Zeisler Decl., Ex. D at 1 (emphasis added).)

Agreement.  To now permit Plaintiff to proceed with a similar claim on the same contract against Defendants and to submit evidence demonstrating of the value of Da Capo's technology and intellectual property, when Defendants were prevented from proving that same theory of damages because of Plaintiff's obstructionist discovery conduct, would be prejudicial to Defendants and would be contrary to the purposes of Rule 37 because it would effectively reward Plaintiff for his obstructionist discovery tactics.

While Judge Brieant's imposition of the sanction against Plaintiff in January 2004 was held to be an abuse of discretion due to his failure to consider Russian law, his failure adequately to state the facts and law underlying his conclusion and his failure to consider lesser sanctions, now that the Court has considered Russian law, the efficacy of lesser sanctions and reviewed the record in this case anew, Judge Brieant's conclusions – though including an abuse of discretion – were correct in substance and supported by the record.  The sanction of dismissing Plaintiff's complaint and granting Da Capo's counterclaims originally imposed on January 30, 2004, is re-imposed.

**B.  Plaintiff's Partial Motion for Summary Judgment Dismissing the Third Counterclaim for Conversion**

Plaintiff moves for summary judgment dismissing Da Capo's conversion counterclaim.  Plaintiff asserts that ZeTek Russia is a Russian Autonomous Non-Commercial Organization ("ANCO")[29] and that, under Russian Law, neither ZeTek, its successor Da Capo nor any other entity has an ownership interest in ZeTek Russia's assets.  Therefore, Plaintiff argues, Da Capo's claim for conversion of assets belonging to ZeTek Russia must fail because Da Capo had no ownership interests in ZeTek Russia

---

[29]      In the initial Complaint and at various points in testimony, Plaintiff has referred to ZeTek Russia as a wholly owned subsidiary of ZeTek.  Plaintiff also moves to amend his complaint to correct this mistake.  Defendants oppose Plaintiff's motion to amend, claiming general bad faith and undue delay.

assets as a matter of law.  In opposition, Da Capo argues that, notwithstanding ZeTek Russia's status as an ANCO, pursuant to contract, ZeTek had ownership rights in assets created by ZeTek Russia for ZeTek's benefit.

### 1.  Legal Standard

In order to meet its burden on a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1988)).  The non-moving party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful."  Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations omitted).

### 2.  Mootness

As a threshold matter, Da Capo argues that Plaintiff's motion for summary judgment to dismiss Da Capo's conversion claim will be rendered moot if this Court affirms Judge Brieant's Rule 37(b) sanctions.  Da Capo notes that the Second Circuit stated that "the conversion issues raised by Shcherbakovskiy may 'become irrelevant if a valid dismissal as a sanction is entered' on remand."  (Def. SJ Mem. at 1 n.1 (quoting

Shcherbakovskiy, 490 F.3d at 141).)[30]   Because the affirmance of Judge Brieant's

sanctions will result in re-imposing a $1,400,000 jury verdict based at least in part on Da

Capo's conversion counterclaim, letting such a judgment stand would be inequitable if

Plaintiff's instant motion for summary judgment has merit, and particularly so because

the Second Circuit discounted Judge Brieant's denial of Plaintiff's May 5, 2003 motion to

dismiss the conversion counterclaim, making many of the same factual and legal

arguments as "not particularly responsive to the issue raised."  Shcherbakovskiy, 490

F.3d at 141.  Therefore, Plaintiff's motion for summary judgment is addressed on the

merits.

### 3.  Expert Opinions on Russian Law

Most of the material facts are undisputed for the purposes of the instant summary

judgment motion, and its disposition turns on expert opinions on Russian Law presented

by the parties.  Many of the material points of Russian law are undisputed between the

experts.  Though Da Capo argues Plaintiff should be estopped because of undue delay

and bad faith from arguing that ZeTek Russia is an ANCO (Def. SJ Mem. at 15-17), Da

Capo does not seriously dispute that ZeTek Russia was, in fact, an ANCO.  (Pl. 56.1 ¶ 2;

Def 56.1 ¶ 2.)[31]   Da Capo's expert, Professor Peter B. Maggs, also does not dispute the

proposition put forth by Plaintiff's expert, Professor William Elliott Butler, that no entity

other than an ANCO itself (or perhaps the Russian government) can have an ownership

interest in the assets of an ANCO; rather Professor Maggs opines that Professor Butler

only answered a limited (and irrelevant) question.  (See Butler Decl. ¶¶ 13-15; Maggs

---

[30]     Defendant/Counterclaim-Plaintiff Da Capo's Memorandum of Law in Opposition to
Shcherbakovskiy's Motion for Summary Judgment Dismissing the Third Counterclaim for Conversion and
for Leave to Amend the Complaint filed September 25, 2009 is referred to herein as "Def. SJ Mem."
[31]     Plaintiff's Local Rule 56.1 Statement dated August 14, 2009 and Da Capo's Counter-Statement of
Fact Pursuant to Local Rule 56.1 are referred to herein as "Pl. 56.1" and "Def. 56.1"

Decl. ¶¶ 5-6.)[32]  Notwithstanding the point that Da Capo may not have an ownership

interest over ZeTek Russia's assets by virtue of ZeTek Russia's status as an ANCO,

Professor Maggs notes that "[a]n autonomous noncommercial organization, such as

ZeTek Power Russia is permitted under Russian law to enter into binding agreements

with private persons or entities, such as ZeTek, and can supply goods and services to

those persons or entities."  (Maggs Decl. ¶ 19; see also id. ¶¶ 20, 21, 29.)  Professor

Maggs further opines that if ZeTek Russia was in possession of assets over which ZeTek

had a contractual right of ownership, Da Capo has a private cause of action against an

individual who removed that property from ZeTek Russia.  (Id. ¶¶ 22-27.)  Professor

Butler does not dispute the point that an ANCO has the legal capacity to engage in

entrepreneurial activity, including the right to enter into contracts with for-profit

businesses.  (See Butler Reply Decl. ¶ 10.)[33]

Defendant therefore argues that, pursuant to contracts between ZeTek and ZeTek

Russia and between ZeTek and Dr. Karichev, an officer of ZeTek Russia, assets

developed and produced by ZeTek Russia were done so for the benefit of ZeTek and

were therefore the property of ZeTek, notwithstanding the fact that assets may have been

in the physical custody of ZeTek Russia.  (See Def. 56.1 ¶¶ 17-23; Def. SJ Mem. at 2-4,

6; Zeisler SJ Decl., Ex. H.)[34]  Plaintiff's expert, in a reply declaration, does not directly

contradict this point and evades the question by stating that he has not seen documents

---

[32]     The Witness Statement of William Elliott Butler dated July 27, 2009 and the Declaration of Peter
B. Maggs dated September 25, 2009 are referred to herein as "Butler Decl." and "Maggs Decl."
[33]     The Second Witness Statement of William Elliott Butler dated October 13, 2009 is referred to
herein as "Butler Reply Decl."
[34]     The Declaration of Aaron M. Zeisler in Opposition to Shcherbakovskiy's Motion for Summary
Judgment dated September 25, 2009 is referred to herein as "Zeisler SJ Decl."

demonstrating that any specific items of property created by ZeTek Russia were assets of ZeTek.  (Butler Reply Decl. ¶ 23.)

Plaintiff concedes in his reply brief that "Dr. Karichev did assign to ZeTek any intellectual property relating to ZeTek's proprietary technology he created during the term of his consultant agreement."  (Pl. SJ Reply Mem. at 5.)[35]  Plaintiff asserts, however, that "[n]othing in Dr. Karichev's consultant agreement obliges him to create or hold any tangible assets for ZeTek."  (id.)  Plaintiff argues that because Da Capo can only claim conversion of tangible assets, Dr. Karichev's agreement is irrelevant.  The consultant agreement, however, covers more than intellectual property:

> I agree . . . to hold in trust for the sole benefit of the Company [ZeTek], and hereby assign to the Company, or its designee, all right, title, and interest in and to any *inventions* relating in any way to the Company's proprietary technology, *original works of authorship*, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I may solely or jointly conceive or develop, reduce to practice, during the period of time that I am a consultant for the Company.

(Zeisler SJ Decl., Ex. H ¶ 3a) (emphasis added).  The assets in question were identified in the trial on damages held before Judge Brieant in December 2004 and listed in Da Capo's opposition papers to the instant motion.  (See Def. SJ Mem. at 5; Def. 56.1 ¶ 23.)  Instead of challenging Da Capo's list of tangible, physical property constructed by ZeTek Russia at Dr. Karichev's direction, Plaintiff avoids the issue and attempts to shift his burden to Da Capo, baldly asserting that "[n]or is there any evidence that [Dr. Karichev] created or held any [tangible] assets."  (Pl. SJ Reply Mem. at 5.)  In view of this genuine dispute of facts material to the conversion counterclaim, the motion is denied.

---

[35]      Plaintiff's Reply Memorandum of Law in Support of his Motion for Summary Judgment Dismissing the Third Counterclaim for Conversion and for Leave to Amend his Complaint is referred to herein as "Pl. SJ Reply Mem."

At a minimum, there exists a genuine issue of material fact as to the ownership status of the items listed at the 2004 damages trial. If the items were assets of ZeTek Russia, Da Capo did not have an ownership claim to them because of ZeTek Russia's status as an ANCO. If, on the other hand, the assets were those of ZeTek, i.e. developed and produced pursuant to a contract between ZeTek Russia (or Dr. Karichev) and ZeTek, for the benefit of ZeTek, Da Capo would have an ownership interest (and might have the Russian equivalent of a claim for conversion) with respect to the assets identified in the December 2004 jury trial on damages. Because there exists a genuine issue of material fact, Plaintiff's motion for summary judgment dismissing Da Capo's third counterclaim for conversion must be denied.

## III. CONCLUSION

For the foregoing reasons, Defendant Da Capo's motion to affirm the Rule 37(b) sanctions previously imposed by Judge Brieant is granted. Plaintiff Grigoriy Shcherbakovskiy's motion for summary judgment dismissing Da Capo's third counterclaim for conversion is denied. The default judgment in favor of Da Capo in the amount of $1,400,000 plus prejudgment interest in the amount of $380,416.44 for a total judgment of $1,780,416.44 previously entered on January 3, 2005 is re-entered *nunc pro tunc*.

IT IS SO ORDERED.

Dated: New York, New York
July 30, 2010

Robert P. Patterson, Jr.
U.S.D.J.

32

Copies of this order were faxed to:

Eric R. Levine
Stephen L. Weinstein
Eiseman, Levine, Lehrhaupt & Kakoyiannis, P.C.
805 Third Avenue
10th Floor
New York , NY 10022
(212) 752-1000
Fax: (212) 355-4608

Aaron Mark Zeisler
Satterlee Stephens Burke & Burke LLP
230 Park Avenue
New York , NY 10169
(212) 818-9200
Fax: (212) 818-9606

33